UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 21-CR-60167

UNITED STATES OF AMERICA,

vs.

JARET BRIETSTEIN
      Defendant.

_____/

## SENTENCING MEMORANDUM AND
## MOTION FOR DOWNWARD DEPARTURE AND VARIANCE

Defendant, Jaret Brietstein, by and through his Attorney, Robert Melchiorre, comes before this Court for sentencing after having pled guilty to Counts One and Two of the Information, the charges of knowingly and intentionally distributing and possessing with intent to distribute at least 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1).

### I.    Safety Valve and Mandatory Minimum

Both of the counts to which Mr. Brietstein plead guilty carry a mandatory minimum term of imprisonment of ten (10) years, subject to the section pursuant to 18 U.S.C. § 3553(f) and Section 5C1.2 of the Sentencing Guidelines.  Under Section 5C1.2, the Court may impose a sentence without regard to any mandatory minimum sentence, if the following prerequisites are met:

1) The Defendant is found to be a Criminal History Category I offender as determined under the Sentencing Guidelines;

2) The Defendant is not found to have used violence or threats of violence, or to have possessed a firearm or other dangerous weapon in connection with the offense;

3) The offense did not result in death or serious bodily injury to any person;

1

4) The Defendant is not found to be an organizer, leader, manager, or supervisor of others in the offense; and,

5) The Defendant has provided the United States, between the change of plea and sentencing, a statement truthfully setting forth all information and evidence the Defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme as charged.

Furthermore, under 18 U.S.C.. § 3553(f)(1)-(5) the Court shall impose a sentence without regard to any minimum sentence if the Court finds at sentencing, after the Government as been afforded the opportunity to make a recommendation that:

1) The defendant does not have –

   a. More than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense as determined under the sentencing guidelines;

   b. A prior 3-point offense, as determined under the sentencing guidelines; and

   c. A prior 2-point violent offense, as determined under the sentencing guidelines;

2) The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense;

3) The offense did not result in death or serious bodily injury to any person;

4) The defendant was not an organizer, leader, manager, or supervisor of others, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

5) Not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has

concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

The Defendant meets the criteria set forth in 18 U.S.S.G. § 3553(f)(1)-(5). See PSR ¶ 71. The Defendant meets the criteria in § 5C1.2(a)(1)-(5) of the Sentencing Guidelines. See PSR ¶ 24. The United States and the Defendant agreed that the if the Defendant meets the criteria, they will jointly recommend that the court impose a sentence without regard to any statutory minimum sentence. See Plea Agreement at ¶ 7. As such, the Court shall impose a sentence without regard to any statutory minimum sentence.

As indicated in the Presentence Investigation Report ("PSR"), dated September 15, 2021, by the probation officer, the **Total Offense Level** for Mr. Brietstein is 27. See PSR ¶ 32. Mr. Brietstein's **Total Criminal History Score** places him in Category I. See PSR ¶ 72. Mr. Brietstein's sentencing guideline range is 70-87 months. See Addendum to Presentence Report at Supplemental Information.

The advisory guideline range is but one factor to be considered in determining the sentence of a defendant so that it is sufficient, but not greater than necessary. See Kimbrough v. United States, 552 U.S. 85, 101 (2007) (quoting 18 U.S.S.G. § 3553(a)). The Court shall consider the following factors when determining a particular sentence:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The purpose and need for a sentence imposed;

3) The kinds of sentences available;

3

4) The advisory guideline range;

5) Any policy statements issued by the Sentencing Commission;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to victims of the offense

18 U.S.S.G. § 3553(a).

After these considerations under § 3553(a), as well as other factors unique to the Defendant, including his entire background and character, <u>not</u> just the negatives characteristics and negative events reflected in his criminal history, the Court can conclude that a sentence below the advisory guidelines is an appropriate sentence for Mr. Brietstein. Additionally, not only are the Guidelines not mandatory, the sentencing court is not "to presume that a sentence within the applicable Guideline range is reasonable." <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009).

### **I. MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE**

1. **Offense Conduct**.

Relatively speaking, these transactions did not cover any extensive period of time. They occurred within a two-month time period from December 2020 to January 2021. These were transactions that involved a defendant with drug and gambling addictions. He was selling meth so that he could feed his addictions, including alcohol and substance abuse and gambling. No evidence was presented, nor exists, of Mr. Brietstein living a lavish lifestyle as exhibited by his having zero net worth. See PSR ¶ 70. Prior to his arrest Mr. Brietstein lived in a commercial property with a small living space with his significant other.

Mr. Brietstein reported to Probation that he was using a between one half and one gram of meth on a daily basis. See PSR ¶ 58. Based upon Mr. Briestein's reported drug use he would obtain up 30 grams of meth every month for personal use.

Mr. Brietstein has nothing in his name.  These drug charges were not meant to earn significant money, but rather to feed his drug addictions.  Again, this is indicated by the nominal amount the Mr. Briestein made in these transactions.  Specifically, as Mr. Brietstein made $300.00 in the transaction on January 28, 2021.  See PSR ⸿ 14.  Additionally, Mr. Brietstein is a *first-time* drug offender, that faces an extremely high guideline range of 70-87 months; the range is based on the fact that the meth at issue, i.e. ICE, is disproportionately punished when compared to meth mixture and all other drugs.

2.    **Disparity of Methamphetamine Mixture (diluted) vs. Actual ("ICE")**.

The uniqueness of pure methamphetamine that once existed is no longer the reality within the drug trade.  When the Sentencing Guidelines were first drafted, it was thought that those obtaining/acquiring pure methamphetamine, commonly known as "ICE", were those at the top of the drug trade "food chain" and were considered the high-level dealers.  Therefore, the penalties for those distributing ICE were more severe than those that were distributing a mixture of meth that was either a) diluted as the ICE made its way down the food chain and eventually to the streets or b) that was "shake-n-bake" meth.

The underlying theory behind increasing a defendant's sentence based on drug purity is found in the comments of U.S.S.G. § 2D1.1, which states that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G § 2D1.1 cmt. n. 27(c). "The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution. However, the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality. As illustrated [in the chart below], the average purity of methamphetamine

today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true." U.S. v. Ibarra-Sandoval, 265 F.Supp.3d 1249, 1255 (D. New Mexico, 2017).



Source: DEA

As depicted above, since 2007, the price of pure meth has decreased from $293 per gram down to $70 per gram in 2013. Over that same time period, the purity of meth increased from 40.4% to 94%. In other words, the meth became purer as the price of meth dropped, which means that it has become more and more common as it is significantly cheaper to obtain compared to what it would cost about 12 years ago. This trend continues as depicted by the chart found in U.S. v. Nawanna where "from 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure." U.S. v.

<u>Nawanna</u>, 321 F.Supp.3d 943, 951 (N.D. Iowa, 2018).  See chart below.



Figure 62. Domestic Methamphetamine Purchases January 2011 - September 2016.

And thus the court in <u>Nawanna</u> held that "because today's methamphetamine is substantially pure, purity is *not* a proxy for relative culpability." <u>Nawanna</u> at 951 (emphasis added). "Because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive."  <u>Id.</u> at 954.  Nawanna was eventually sentenced to 200 months[1], which was a downward variance from his guideline range of 360 months to life, i.e. a downward variance of at least 160 months.  He was found to be responsible for 4,406.39 grams of ICE (just shy of the next base offense level), had a Criminal History Category of V, and was assessed +3 level enhancement under U.S.S.G. 3B1.1(c).

The following table depicts the significant difference in guideline range sentences between not only pure meth and meth mixture, but also as compared against crack cocaine,

---

[1] This was prior to any credit given for Nawanna's substantial assistance under U.S.S.G. § 5K1.1.

heroin, cocaine, and marijuana.  Again, the differences in the guideline ranges are significant.  If the same deductions that have been applied to Mr. Brietstein, i.e. 2-level deduction pursuant to § 2D1.1(b)(18)  for meeting the criteria of set forth in (1)-(5) of § 5C1.2(a) and a 3-level reduction for accepting responsibility(for offense levels 16 or greater and only a 2-level deduction for offense level less than 16) , are applied to a defendant that is responsible for 150 G – 500 G of each of the following drugs, the guideline range is significantly higher for a defendant possessing Pure Methamphetamine or "ICE" versus a defendant possessing a meth mixture, i.e. there is a difference of 34 months on the low-end of the guideline range and a difference of 41 months on the high-end of the guideline range.

| DRUG TYPE COMPARISON | | | | |
|---|---|---|---|---|
| **DRUG TYPE** | **QUANTITY** | **TOTAL OFFENSE LEVEL** | **CRIMINAL HISTORY CATERGORY** | **GUIDELINE RANGE** |
| Methamphetamine – Pure or "ICE" | 150 – 500 G | 27 | I | 70-87 |
| Crack Cocaine | 112 – 196 G | 21 | I | 36-46 |
| Methamphetamine mixture | 50 – 200 G | 19 | I | 30-37 |
| Heroin | 100 – 400 G | 19 | I | 30-37 |
| Cocaine – powder | 100 – 200 G | 12 | I | 10-16 |
| Marijuana | < 1 Kg | 2 | I | 0-6 |

Additionally, within each base offense level of the Drug Quantity Table, there exists a 10:1 ratio of pure meth ("ICE") to meth mixture.  U.S.S.G § 2D1.1.  The following are different examples and explanations, found in Nawanna, of how pure meth is punished more severely than meth mixture:

> "Defendant A, who sold 5 grams of methamphetamine to his five customers (1 gram per customer), versus Defendant B, who sold 49 grams of methamphetamine to 25 customers (almost 2 grams per customer).  Without other

adjustments, if Defendant A's methamphetamine is treated as ice or actual (pure) methamphetamine, his resulting base offense level is 24. Similarly, without other adjustments, if Defendant B's methamphetamine is treated as a mixture, his base offense level is 22. Thus, the Commission's judgment is that Defendant A is more culpable, even though he sold far less methamphetamine to far fewer people, but that is contrary to what a reasonable observer would like conclude".

Nawanna at 952.

Additionally, the prosecution in Nawanna, agreeing with the defendant's example above, provided its own example:

In response, the prosecution argues that, if Nawanna's position is adopted, it leads to the perverse result that a defendant who sold 150 grams of pure methamphetamine, treated as pure methamphetamine, would be treated the same as a defendant who sold 4 kilograms of actual (pure) methamphetamine whose methamphetamine was treated as a mixture. That is precisely the result of the *current* Guidelines calculation, based on the 10-to-1 ratio, which would score both defendants as level 32. (Citation omitted). On the other hand, if the methamphetamine attributed to both defendant is treated as methamphetamine mixture, as Nawanna argues it should be, the defendant who sold 150 grams of methamphetamine would be scored as level 24, while the defendant who sold 4 kilograms of methamphetamine would still be scored as level 32. The difference *does* more properly reflect the relative culpability of the two defendants.

Nawanna at 958 n.7.

Both examples efficiently describe the problem with the Guidelines' handling of pure meth vs. meth mixture considering the change that has occurred over the past 15-20 years that has resulted in the new normal of pure meth being found everywhere.

In U.S. v. Ortega, the Court found that a sentence below the guideline range was appropriate for Ortega because he was "at most, a street-level distributor, dealing drugs in the same purity as most methamphetamine sold on the street"...and "to punish him as harshly as an upper-level distributor because of a presumptive ten-to-one ratio does not reflect his position in the hierarchy nor will it promote respect for the law." U.S. v. Ortega, 2010 WL 1994870 at 7 (D. Nebraska, 2010). Additionally, the Court in U.S. v. Harry states that "there seems to be no

empirical evidence supporting the need for a drastically-increased sentence based solely on the purity of the meth at issue.  U.S. v. Harry, 313 F.Supp.3d 969, 973 (N.D. Iowa, 2018).  In Harry, after the defendant was found guilty at jury trial of possession with intent to distribute at least 50 grams of pure meth, the Court sentenced the defendant to 280 months, which was a downward variance from the defendant's guideline range of 360 months to life, i.e. a downward variance of at least 80 months.  The defendant in Harry was found responsible for 1,800.3 grams of pure meth and had a Criminal History Category of VI.

In Spears v. U.S., the Court held a sentencing judge has the power to "reject the disparity created by the crack-to-powder ratio."  Spears v. U.S., 555 U.S. 261, 265 (2009).  Like the Court in Spears, the sentencing courts in meth cases have begun to follow suit to that of the crack-cocaine sentencing courts; and they have addressed the disparity that exists between pure meth ("ICE") and meth mixture, i.e. the 10:1 ratio disparity between pure meth ("ICE") and a meth mixture.  As such, like the sentencing court in Ortega, the Court here can reject the higher ratio that is to be assessed pure meth and therefore reject the 4-level increase, which is the result of a 10:1 ratio between pure meth ("ICE") and a meth mixture.

In U.S. v. Hayes, the sentencing court followed the court's recommendation in Spears and reduced the guideline range by one-third "in response to the fundamental problems with the methamphetamine Guidelines range.  The one-third reduction is a good starting point and a reasonable way to express [the court's] policy disagreement with the Guidelines."  U.S. v. Hayes, 948 F.Supp.2d 1009, 1031 (N.D. Iowa, 2013).

In Nawanna, the court rejected the methamphetamine guidelines based on two reasons: 1) because they "are based on a flawed assumption that methamphetamine purity is a proxy for role in the offense," Nawanna at 954; and 2) because the 10:1 ratio of pure meth to a meth mixture is not based on empirical evidence, which creates a Guidelines range for pure meth that

is not in the "heartlands." Id. at 950-955.  Even the prosecution in Nawanna admitted with the

defendant's argument that the 10-to-1 ratio is unsupported by and not based on empirical

evidence.  Nawanna at 950-951.  Furthermore, the parties in Nawanna agreed that they "were

unaware of any statement in the guidelines or elsewhere of why only certain controlled

substances, including meth, are singled out in the Guidelines themselves for enhancement based

on purity, while others, such as heroin, are not.  Nawanna at 949.

In Harry, the Court adopted the approach used and described in Nawanna, i.e. based on

policy disagreement, when the Court calculated an "alternative Guidelines range, starting with a

base offense level determined by reference to the methamphetamine mixture Guidelines."  Harry

at 974.  "While it may seem logical to punish a pure substance more than mixed substance, there

is no support in the legislative history to explain the formula underlying greater

methamphetamine purity to greater months of imprisonment."  Hayes at 1025.

Additionally, take the recent and significant rise in fentanyl-based overdoses nationwide.

As it pertains to the Central District, Peoria County Coroner reported 71 fentanyl-related

overdoses in heroine starting in 2016 through November, 2018.  *Peoria Counts Cost of Fentanyl*

*Deaths after CDC Names Its Deadliest Drug*.  December 12, 2018,

https://week.com/news/2018/12/12/peoria-counts-cost-of-fentanyl-deaths-after-cdc-names-it-

deadliest-drug/.  This rise in overdose-related deaths is caused, at least in some cases, by the drug

users not knowing what is in the drug mixture.

3.      **The Methamphetamine Guidelines are not Heartlands**.

The Commission intends the sentencing courts to treat each

guideline as a carving out a "heartland," a set of typical cases

embodying the conduct that each guideline describes.  When a

court finds an atypical case, one to which a particular guideline

linguistically applies but where conduct significantly differs from

the norm, the court may consider whether a departure is warranted.

U.S. Sentencing Guidelines Manual § 1.6 (1987).

It was the intention of the Commission to make each sentencing guideline a heartland so

that there would exist a consistency in sentencing such that a departure from the guideline would

be a rare occurrence.  Despite that intention, "sentencing data over the years reveal that the

Guidelines range for methamphetamine offenses do not constitute the typical case or heartland."

Hayes. at 1030.  In 2017 and "for the third year in a row, methamphetamine offenses were the

most severely punished drug crime, with an average length of imprisonment of 91 months."  U.S

Sentencing Commission, Overview of Federal Criminal Cases, Fiscal Year 2017, available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2018/FY17_Overview_Federal_Criminal_Cases.pdf.  In 2017, only **30.1%** of

methamphetamine trafficking offenders were sentenced within their range, and **0%** were

sentenced above their range; in other words, almost **70%** of methamphetamine trafficking

offenders were sentenced **below** their guideline range.  U.S. Sentencing Commission, Quick

Facts Methamphetamine Trafficking Offenses available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

facts/Methamphetamine_FY17.pdf (emphasis added) (hereinafter "Quick Facts") and attached

hereto as Exhibit A.  Additionally, in 2017, methamphetamine trafficking offenders received an

average reduction in their *non-government sponsored* sentence of **33.8%** regardless of the

weight, i.e. "The median Base Offense Level in these cases was 32.  This corresponds to a

quantity of drugs between 3.3 and 11.0 pounds of methamphetamine." U.S. Sentencing

Commission, Quick Facts Methamphetamine Trafficking Offenses available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

facts/Methamphetamine_FY17.pdf. See Quick Facts (emphasis added).  This type of pattern, i.e.
that methamphetamine sentences below the guideline range is the standard, indicates that the
Guideline range for methamphetamine offenses is not the heartland and that the guideline ranges
need to be adjusted down.  "The heartland itself is flawed.  The high number of downward
departures indicates that the Guidelines range is not a heartland or typical case." Hayes at 1030.
"A district court's decision to vary from the advisory Guidelines may attract greatest respect
when the sentencing judge finds a particular case 'outside the 'heartland' to which the
Commission intends individual Guidelines to apply.'" Kimbrough at 89 (*citing* Rita, 551 U.S. at
351).

4.    **The Methamphetamine Guidelines are not based on Empirical Data**.

      In United States v. Hayes, 948 F.Supp.2d 1009 (2013), Judge Bennett issued a sentencing
order wherein he addressed several issues concerning the methamphetamine sentencing
guidelines, including the development of the sentencing guidelines as compared to the
development of the methamphetamine guidelines.  His sentencing order cited prior case law,
federal law, reports to Congress, and other publications and reports.  To say the least, the
sentencing order was thorough.

      One of the main points of the Judge Bennett's sentencing order is that the original
sentencing guidelines were developed through an empirical approach that included analysis of
10,000 presentence reports. Hayes at 1019.  The Court repeatedly praised the empirical process
by which the Guidelines were written, Id., after all, it is the Commission's role to draft the
guidelines and to "base its determinations on empirical data and national experience, guided by a
professional staff with appropriate expertise." United States v. Pruitt, 502 F.3d 1154, 1171 (10th
Cir. 2007).

However, when it came to drug-trafficking offenses, the Commission did not use the same empirical approach in developing guideline ranges, and instead the Commission conformed the drug-trafficking guideline ranges with the statutory minimums that were being implemented by Congress as a result of certain political and social atmospheres, e.g. "Congress swiftly enacted the Anti-Drug Abuse Act of 1986" as a result of the drug overdose death of Len Bias, a University of Maryland basketball player.  Hayes at 1020.  The mandatory minimums that were being implemented by Congress, which focused on the drug weight and quantity, effectively raised the guideline ranges for drug-trafficking offenses.

Judge Bennett went on to analyze the sentences imposed for methamphetamine cases and found that in 2011, the average sentence length was 144 months for methamphetamine offenders; this was the "highest average sentence length for any drug type," even though only **38.3%** of methamphetamine offenders that were subject to a mandatory minimum in 2011 received a sentence within the Guidelines range.  Id. at 1025 (emphasis added).  In other words, over **60%** of methamphetamine offenders were receiving sentences below the guideline range, yet the average sentence was still the highest average sentence among drug-trafficking offenses.  "Thus, methamphetamine Guidelines are entitled to less deference than those Guidelines that were based on the Commission's exercise of institutional expertise and empirical analysis." Id. at 1027.  "A variance based on a policy disagreement is particularly appropriate for methamphetamine offenses because the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and the Guidelines are not based on empirical data and national experience.  Hayes at 1031 (citing Kimbrough v. United States, 552 U.S. at 96 (2007) ("The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses."); (citing Gall v. U.S., 552 U.S. 38, 46 n.2 (2007) ("[T]he Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug

offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes.").

5.     **Sentencing Methamphetamine with the Safety Valve.**

In methamphetamine case involving the safety valve, courts have wrestled how to calculate the magnitude of the downward variance based upon policy disagreements with the guidelines. U.S. v. Johnson, 379 F.Supp. 3d 1213, 1228 (M.D. Alabama 2019). In U.S. v. Johnson, 379 F.Supp. 3d 1213, 1229 (M.D. Alabama 2019), the court implemented a variance in two steps each of which corresponded to the policy disagreements with the overemphasis on purity and quantity. First, to address the purity issue, the court, like many other courts, re-calculated the base offense level by using the methamphetamine mixture instead of the actual or ICE Guideline. Id. at 1229. Second, to address the quantity issue, the court reduced the offense level by two levels to offset the excessive significance that the drug-trafficking guidelines assign to the quantity of drug, which do not always reflect the offenders role, and thus culpability. *Id*. The court noted that the Johsnon's role was somewhere between a courier and broker or middleman. Id. at 1228.

Analogously to this case, Mr. Brietstein was between a courier and broker or middleman. On the January 14, 2021 transaction Mr. Brietsein was not in possession of the methamphetamine, but had to pick it up before meeting with the undercover. See PSR ⸿ 10-11. On the January 28, 2021 transaction, he did not have the methamphetamine in his possession, but another person would be arriving with it. See PSR ⸿ 12. After the person arrived with the methamphetamine, Mr. Brietstein picked it up and delivered it to the undercover. See PSR ⸿ 13. Mr. Briestein made $300.00 from this transaction. See PSR ⸿ 14. These transactions are the epitome of a courier and broker or middleman.

If the Court were to follow the approach in <u>Johnson</u> and use the methamphetamine mixture, Mr. Brietstein would be at an offense level 24.  Second, the following the reasoning in Johnson, an additional two-level reduction to offset the quantity critique would place Mr. Brietstein at a level 22.  Then with the two-level safety valve reduction and a three-level acceptance of responsibility would decrease Mr. Bietstein to a level 17, which under a Criminal History Category I would place Mr. Brietstein in the 24-30 month range.

6.      <u>Support – Character Letters.</u>

Mr. Brietstein submits twenty-two character and support letters written by his family and friends.  Said letters are attached as Exhibits 1-22.

7.      <u>Education and Certificates.</u>

Mr. Brietstein has completed college at Valencia and has previously held a Series 7 and Series 24 license for the sale of insurance and securities.   See PSR ⸿ 61-62

WHEREFORE, the Defendant, JARET BRIETSTEIN, respectfully requests of this Court, for the reasons contained in this Sentencing Memorandum and Motion for Downward Departure and Variance, the following:

A.  For a downward departure from his Sentencing Guideline range;

B.  For a downward variance from his final Sentencing Guideline range; and

C.  For any other relief that the Court deems equitable and just under the circumstances.

                                        Jaret Brietstein, Defendant

Date:   January 7, 2022

                                        Respectfully submitted,

                        By:     /s/ Robert Melchiorre
                        **ROBERT MELCHIORRE, ESQUIRE**
                                Counsel for defendant Jaret Brietstein
                                3900 Military Trail, Suite 600
                                Jupiter, FL 33458
                                Telephone:(561) 295-5825
                                Bar No: 64965

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of January, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Ms. Donald Chase, II
Assistant United States Attorney
500 East Broward Blvd., 7th Floor
Fort Lauderdale, FL 33394
donald.chase@usdoj.gov


JARET BRIETSTEIN, Defendant

 /s/ Robert Melchiorre
Attorney for Defendant
3900 Military Trail, Suite 600
Jupiter, FL 33458
Phone: (561) 295-5825
rob@kmwlegal.com



Jeffrey and Linda Wegweiser
68 Hickory Road
Hollywood, FL 33312


Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301


Re: United States v. Jaret Brietstein

October 29, 2021

Dear Judge Dimitrouleas;

We are writing on behalf of Jaret Brietstein. We have known Jaret for over 20 years. He is the brother of our son in law so he has been a part of our family for many years and we have had the opportunity to see his interactions with our children, parents, grandchildren and pets. We have always thought favorably of him. Jaret has displayed only kindness and cordiality in our presence.

We would ask for you to show leniency towards Jaret as continued incarceration would only be detrimental for Jaret and jeopardize his chances to be a good member of society. We are sure he regrets his mistakes and will not repeat them.
Thank you.

Sincerely,

Jeffrey and Linda Wegweiser

# Exhibit 2

Eric Emerman
5200 Sugar Run Drive, New Albany, Ohio 43054
P: 614-946-0822 E: eric@dbatcolumbus.com

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courthouse206B, Chambers 206F
Fort Lauderdale, Florida 33301

Re: United States vs. Jaret Brietstein O 2021cr60167

Dear Judge Dimitrouleas,

My name is Eric Emerman and I am contacting you regarding Jaret Brietstein. Jaret is my first cousin and the son of my mom's sister (Aunt) Barbara and (Uncle) Richard Brietstein.

Let me start by saying that family means everything to my family and me. There is no need to look any further than Thanksgiving and the holidays. My mother and father host a Thanksgiving dinner every year, and it's not uncommon for them to have 40+ relatives. Similarly, every time I can remember visiting my Aunt and Uncle's house in Florida, it was exactly the same. It's not an event without the entire family there. Growing up, I thought this was overwhelming. Now that I'm an adult, I appreciate the family closeness and look forward to these large family gatherings.

Growing up, Jaret and I shared a special bond due to our closeness in age. Being the youngest in each of our families meant spending considerable time together. Each year, my family spent winter break in Florida visiting with my grandparents, Aunt Barbara, Uncle Richie, Jason and Jaret. Those were some of the best vacations and memories I have growing up. Spending time at the beach, strolling through the flea markets, attending parades, and day trips to amusement parks were all fun, but spending time with my cousins and my family were what made it special.

Jaret was adventurous and fun as a kid. In Florida, we would spend entire days outside, riding bikes, exploring in the woods, playing ball...just being kids. When Jaret and Jason came to Cleveland to visit us in the summer, Jaret would tag along to my summer camp and join me on camp field trips. I looked forward to spending time with my cousin and counted down the days to winters in Florida and seeing him in Cleveland in the summers.

As we grew up and family vacations were a thing of the past, I would hear about Jaret's new adventures in life and business. Like many, Jaret has had many successes and failures in business. Like an entrepreneur, Jaret was always thinking big, pitching his grand ideas and various opportunities. As an entrepreneur and business owner myself, Jaret's drive, vision, passion and work ethic are the characteristics that make him special and are qualities that I look for in people.

Jaret had a strong work ethic instilled in him by his parents at a young age. My Uncle Richie opened and built a successful podiatry practice in Florida. My Aunt Barbara, not to be outdone, started an event planning business, then switched gears to open a business of moving seniors to assisted living facilities. Jaret spent time in both businesses, working tirelessly to help my Aunt. Jaret later became a licensed senior move manager, which is when he was at his best. Jaret is naturally a caring and compassionate person, with a big heart and warm personality. Jaret would go above and beyond with his clients, being there for them, being a good listener and making their transition easier.

I believe some of Jaret's struggles are due to my Aunt and Uncle's health issues. My Uncle Richie has had health and heart issues for years, being in and out of hospitals for testing and procedures. But it was my Aunt Barbara's 3 battles with cancer that took its toll on Jaret and the family. As a son, I cannot even begin to imagine what it's like having to watch my mom go through years of chemotherapy and radiation. Jaret is very close with my Aunt, and watching his mom suffer must have been killing him inside. Yet he stood by her side for years as she battled the disease. He was supportive, caring, and compassionate as always.

Jaret has made some poor choices in life, in both choosing friends and "business" opportunities. Some of the issues are that he wants to find good in people and trusts more than he should. But he also has unrealistic expectations of himself which has led him down a wrong path. Never being satisfied is a blessing and curse. Unfortunately for Jaret and his family, poor choices have cast a shadow over all the good that he has done. Jaret just needs direction & guidance, as well as some rehabilitation to become the man I know he wants to be. Jaret is still the same kid I grew up with: kind, compassionate, loyal, driven, family-oriented and honest.

I'm writing this letter for your consideration of a lesser sentence for Jaret. My Aunt and Uncle need family around more than ever, and Jaret needs his family to help him navigate back to the path he was meant to be on and wants to be on. Jaret needs another chance for himself and for his family. I believe Jaret has the necessary support system to get him back there.

Thank you so much for your consideration.

Eric Emerman
President & Owner, D-BAT Columbus East & North
President & Owner, SuperTots Columbus

# Exhibit 3

Susan J Jacobs
29 Princeton Road
Chestnut Hill, Massachusetts 02467
Susiejunej@gmail.com
617-549-9454
November 9, 2021

Honorable Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courthouse 205B, Chambers 205F
Ft. Lauderdale, Florida 33301

Re: United States v Jaret Brietstein,  Case 0:2021cr60167

Dear Judge Dimitrouleas:

I am proud to be a very close friend of Jaret's mother since our teenage years
together, and of Jaret's father since college.  Therefore, I have known Jaret
Brietstein since his birth, 45 years ago.

I am a 73 yr. old college graduate with a Bachelor of Arts degree from Kent
State University.  I was an Art teacher for many years in public schools, and
then continued to be a volunteer in schools enhancing their curriculums and
improving the arts.  I love kids and have an interest in improving their
education and their well-being. With three daughters and five grandchildren,
my husband and I have a meaningful stake in the fates of future generations.

My family and Jaret's family have been fortunate to spend many holidays
together. During school vacations, my husband and our daughters, would visit
Florida and have our children play and interact together. Jaret was always
personable and made sure that the girls were welcomed and enjoying
themselves, whether it was at their home, playing games, swimming, or dining
at restaurants.  They looked up to him because of his kindness, sense of
humor, and sweet personality.  When Jaret and his family visited our home in
the town of Boston, he once again would become the big brother to my
girls.  He was always loving and fun, pitching in if he could, by helping with
our youngest by pushing the stroller or sharing his knowledge about the fish
at the aquarium.  This young man around 13 even suggested a driving

solution for me.   As we toured around town in my station wagon, the kids sat in the way back facing backwards.  His suggestion was that I take the turns in the roundabout, or rotary, at a certain angle and at a slower speed to keep the nausea at bay.   A lesson that I still adhere to today!

Not only was he a good role model and friend to children, I also always observed how kind and caring he was to his Grandparents. He was always loving, sensitive and respectful to their needs.  His heart has always been in the right place.  In that same vein, I recall that, when he and his Mother had a "Moving Seniors Business" to assist seniors in the process of downsizing and relocating, he would be able to have meaningful conversations with these new clients, either the seniors or their adult children.  They believed in him during these very trying emotional transitional times, as he took the extra steps to move unwanted furniture, clothing, or jewelry to vendors that would pay for these items and, in return, the money helped the clients pay the moving expenses.  If vendors were not available or interested in the items, Jaret and his mother would donate them to folks or institutions that could make use of them, not just dump them anywhere.

He was always a good employer, not expecting the employees of the business to do anything that he would not do.

Jaret also showed love, care, compassion, and empathy to his mother who is 74 years of age and has had several severe battles with cancer! She also has needed Lymphedema therapy that lasts for weeks at a time. Barbara has always been a hard worker and fundraiser for many charities from Cancer, Alzheimer, and at- risk children's homes, at times which Jaret has assisted in these endeavors. His father, Richard Brietstein, 76 years old, has been a doctor for many decades and has helped thousands of patients, helping them heal from painful wounds.  Sadly, Richard is also in poor health with cardiovascular ailments and Vasculitis, a debilitating disease.

Jaret has been a caring son for his ailing parents.
In turn, the Brietsteins have been loving, caring, and supportive parents to Jaret and his older brother Jason; as you would expect, they are already weakened and devastated by Jaret's arrest.  They would likely suffer significant trauma if he were sentenced to a lengthy prison term that may extend beyond their life expectancies.

As a child, Jaret had an auditory processing disorder that kept him from learning at the speed of other classmates. It is not surprising that he fell behind and was kept back a grade or more in school. Despite this disability, he has had many friends and good jobs as an adult.

Jaret is a good, decent, caring, humble person, who really needs emotional therapy and quality addiction treatment, where he can overcome his addictions and improve his mental health. I believe that he will strongly benefit from such treatments and therapies (more than from prison) that will once again help him to become a man with honor and respect in good health, who can once again contribute to his family, his community and society.

I understand that you have the difficult task of balancing many competing factors in a determination of Jaret's guilt, culpability and sentence, weighing what is in the best interest of the society, the community, as well as Jaret and his family. I hope that this letter has shed some light on the personal impact of your momentous decision on Jaret and his family.

Thank you, Your Honorable Judge Dimitrouleas, for your time and consideration,

Susan J Jacobs



Dear Judge Dimitrouleas,

I am Melanie Weschler, a first cousin to the Brietstein family. I have lived in Plantation since 1977 when my family and I moved here. We were so happy that the Brietsteins were already here! My daughter babysat Jaret and his older brother Jason quite often since we all lived in Plantation. We are a close-knit family since my parents and Jaret's grandparents also lived in south Florida.

Since Jaret worked in his mother Barbara's business of moving and relocating seniors, he was the right person to help me through all the decisions that had to be made for the contents of my mom's home after she died. Jaret was my on-site helper. He contacted and scheduled the necessary vendors, organized, and distributed all the clutter into manageable solutions. I could not have tackled this emotional project without him, especially being an only child, since Barbara had already sold the business. His help and his maturity were so valuable to me at that time. He was the best person for the job.

I have been a nationally registered yoga teacher for 15 years. I have volunteered in Level 6 girl's jail, day and residential drug treatment programs, and the Dan Marino summer camp for autistic children. As a mother and cousin of Jaret's, I really believe therapy would be the most beneficial solution for him, not a long jail time.

--
Sincerely,

Melanie Weschler

# Exhibit 5

**Brad and Debbie Emerman**
6734 Ayleshire Drive, Solon, Ohio 44139
P: (440) 349-9922
E: brademerman@yahoo.com, dke0420@aol.com

Judge William P. Dimitrouleas
U.S. Federal Building & Courthouse
299 East Broward Boulevard
Courthouse 206B, Chambers 206F
Fort Lauderdale, Florida 33301

Re: United States vs Jaret Brietstein O 2021cr60167

Dear Judge Dimitrouleas,

We are Brad and Debbie Emerman, Jaret Brietstein's oldest first cousins. I, Brad,  have known Jaret from the day he was born and have seen him grow into the man he is today. Growing up in Cleveland, Ohio, my family would travel to Florida every winter and would always spend time with the family – Aunt Barbara, Uncle Richie, Jaret, and his brother Jason. We grew up being exceptionally close to our extended family and this time together was priceless. We would celebrate the holidays, birthdays, and made lifelong childhood memories together with all our cousins and family in Florida. When I got married to Debbie in 1993 and started our family, we remained very close to Aunt Barbara, Uncle Richie, Jason, and Jaret.

As an entrepreneur, I currently own two businesses having to do with baseball & softball, my passion. One business manufactures and distributes baseballs, softballs, gear, training products, bags, and other items for the sport. The second company is a specialized state-of-the-art baseball & softball training facility.

My fondest memories of Jaret are the many conversations we would have over the years pertaining to both sports and business. He would be very inquisitive about business, developing business, how to market and sell products, and asked many times how I got started in my field. He is a sports fan and would talk to me about the Marlins, Dolphins, and the Heat (although very biased). I knew from the time Jaret was a young boy that he was a people-person and had a great way of communicating with anyone. As he talked to me about business and sales, I knew he could be successful with some hard work and

determination. As he grew up, I saw him work hard in his various jobs and be very focused on accomplishing his goals.

Growing up, Jaret made several trips to Cleveland for family events. One of the most memorable for our family was when he traveled here during one of our snowy winters. Being from Florida, Jaret would tell us how cold he was, but nonetheless, decided he would play in the snow with our young children (at the time). They built one of the biggest snowmen in the neighborhood complete with carrot nose, a pipe and button eyes. Oddly, a few neighbors still talk about the "amazing snowman" with us to this day. Jaret was always kind, gentle and amazing with our son and daughter as they were considerably younger than him.

As the years passed and everyone grew up and schedules changed, unfortunately we haven't been able to spend as much time together. We are still very close with Aunt Barbara and Uncle Richie, and we get updates on Jaret and his brother Jason all the time. We have watched my aunt and uncle struggle with their health over the last several years and we know Jaret has been there for them through these difficult times. While Jaret has had many ups and downs himself fighting addictions, he still cares deeply about his family. Jaret is one of the kindest people we know. Unfortunately, through difficult times, he has made poor choices by surrounding himself with the wrong people. Ultimately, Jaret is an important part of Aunt Barbara and Uncle Richie's support system during their issues with chronic health problems.

We are confident that Jaret knows he made mistakes and will work hard to become the man we know that he truly can be. We have watched Jaret throughout his life, and know he is dedicated, sincere and has an extremely kind heart. We love him and need him to be part of our family. People make bad decisions in life, but also deserve the opportunity to have a second chance. We are writing this letter for your consideration of a lesser sentence for Jaret.

Thank you for your consideration in this matter.

Kindly,

Brad Emerman
Debbie Emerman



**Marty Emerman**
7462 Villa Ridge, Chagrin Falls, Ohio 44023
P: (216) 533-7658
E: marty@emermanteam.com

Judge William P. Dimitrouleas
U.S. Federal Building & Courthouse
299 East Broward Boulevard
Courthouse 206B, Chambers 206F
Fort Lauderdale, Florida 33301

Re: United States vs Jaret Brietstein O 2021cr60167

Dear Judge Dimitrouleas,

I am writing this letter to help possibly reduce my nephew Jaret Brietstein's future
sentencing. I am Jaret's Uncle Marty Emerman. My wife of 55 years, Nancy Emerman, is
Jaret's mother's sister (Barbara Brietstein).

My passion is playing softball. At age 78, I am fortunate to be able to continue to play in
men's leagues in my hometown of Cleveland, Ohio and travel to tournaments all over the
United States. I have played ball my entire life and have been inducted into several Softball
Hall of Fame's (including a very proud moment being inducted into one on them with my
oldest son Brad).

For over 35 years, I worked as a manufacturer's representative selling hardware and
electrical products to home centers and discount stores in Ohio, West Virginia, and
Western Pennsylvania. When Home Depot finally came into our market, it put many of my
accounts out of business. In 2002, I sold my rep business and joined my wife in real
estate, forming the Emerman Team at Keller Williams Realty.

Presently, I am semi-retired and have an opportunity to "give back" to our community by
volunteering at Meals on Wheels (food for seniors) and the Cleveland Food Bank. I enjoy
this work, and I look forward to it each week.

Every year since my nephew Jaret was a child, our family spent Christmas vacation at
Barbara and her husband Richie's home. Our families would be together for weeks
enjoying the sun, the beach, and we always had great bonding time. During this period, I
watched my nephew work various jobs. He always worked hard, played hard, and enjoyed
life to the fullest.

On many occasions during our vacation, I would help my sister-in-law Barbara with her
Bright Transitions and Bright Start Movers business. Jaret was part of that business and I
watched him work. I was asked many times to help drive a truck or assist in a move. Jaret

worked long hours and did a lot of manual labor. He would always take charge and manage the employees, or clearly lead by example. He was key to helping build Barbara's business. You could tell Jaret enjoyed the work, being in charge, and having a purpose. He also was quick to problem solve or just "get the job done".

Having two boys of my own, I know how difficult this is for Barbara and Richie. As parents, we try to lead by example and teach our children to make good decisions and choices. Unfortunately, my nephew Jaret made both poor choices and terrible decisions. Jaret was taught to take responsibility for his actions. One thing I know about him – he is a good kid with a great heart. Jaret is intelligent, has a kind heart and is compassionate. I am confident that given a second chance, he will undoubtedly have his family's support and will make amends for his mistakes.

I'm writing this letter for your consideration of a lesser sentence for Jaret. Thank you so much for your consideration and support. Our family is very important, and Jaret should be part of it.

Sincerely,

Marty Emerman

Exhibit 7

Courtney Brietstein
4941 SW 34 Terrace
Fort Lauderdale, FL 33312
(954) 817-1603
invitationsonly@gmail.com

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301


Re: United States v. Jaret Brietstein

October 2, 2021

Dear Judge Dimitrouleas:

My name is Courtney Brietstein. I am Jaret Brietstein's sister-in-law. I have been married to Jaret's brother Jason for over 20 years. Jaret has been family for as long as I've known him. When Jason and I first got married, we spent more time with Jaret. Our relationship has changed over the years. Some years we've been closer than others, while some years we've seen him less, but nothing changes the fact that we're all family. Jaret is the uncle of my two teenagers Jett (13) and Jax (16). They both care about him a lot, even if they are not particularly close with him. When they were babies and younger children, Jaret was a much more involved uncle. He was very loving to them and to all of the pets we've had. He has watched our pets and has babysat our children when they were younger. He has stayed in our home with (and without) us many times. I have never seen Jaret be violent. He is a very easy going, friendly and kind-hearted person. He is the type of guy who would help any of his friends or family members if they needed it, no questions asked. He does not always make the best choices, but he would never intentionally cause harm to another person. He has a hard time realizing how much his actions may affect the people who care about him. As an early childhood educator, I am very familiar with this type of behavior, which often begins in early childhood. I think with a lot of support, Jaret can and will do better. His family is willing and able to be there for him and help him. Thank you for your consideration.

Courtney Brietstein

Exhibit 8

My name is Jason Brietstein, I'm Jaret's brother.

I'm 46 and have been married to Courtney Brietstein for 21 years. We met in college where I was the bass player in a successful college band who shared the stage with acts such as Matchbox 20 and others.

This was my focus in college and I did not finish school. However, tell you this to demonstrate what kind of person I am and where my path has taken me. I was into computers in college and spent every night at the computer teaching myself how to build websites, photoshop, and the internet. This is 1998 btw. I worked at a small dial up internet company where I was exposed to the operating system: Linux. At the time this was the David to Windows being a Goliath. The only way to learn the operating system was have a friend or what my BOSS told me to do - RTFM. Read the F'ing Manual. That is what you had to do as there was no other way.

I created a new documentation standard in the Linux world and created at the time the largest Linux community website that I eventually sold to Internet.com when I was 24.

Fast forward 9 years, I've run a marketing agency and have had a chance to work with many businesses including, but not limited to, Benihana, Flex Seal, CK Mondavi Wines, The Health Council, The Baywatch Movie, and recently Bad Boys Movie with Will Smith and Martin Lawrence.

Jaret for the most part is a nice a friendly person. Often times he would question my anger because I am a much more stressed and irritable personality. The daily rigors of life often stress me out considerably more than him.

Jaret on the other hand, who has much less than I do, had not worn his stress on his shoulders, at least not until much later in his life, till his mid-thirties.

Jaret has had some type of auditory learning issue that was never solved, but we (I used to go to the appointments when I was young) saw a lot of different doctors for.
When I was younger I remember going to the Mailman center where he was observed. He was held back into pre-1st for this learning disability.

When we were younger we shared a lot of the same friends. As we got older, more towards college age, my brother and I were not close. He did his own thing and I did mine.
I was focused on my band and business aspirations. I don't know what Jaret was focused on.

He had some opportunities in life. He became a series 7 licensed broker during the dot com boom of the early 2000's. That wasn't easy and was one his life accomplishments, but let the license lapse, probably due to the distractions of addiction, and again, his disability.

Years later, himself and my Mom started a moving company for seniors who need to transition from their homes to senior homes or hospice. For the first few years Jaret ran that business really well. Finally he had a purpose. All the senior homes loved him. Jaret was a large part of the growth of the

business where it moved from no warehouse, to a small warehouse, to a very large warehouse with several trucks. My mother developed breast cancer and Jaret was alone to run the business for a year or two.

Jaret has always been quick with numbers and was able to size up a moving quote quickly and know what it took to get the move done profitably. This wasn't easy to do as each move had so many variables to it.

Many years later as the business grew and my mother couldn't be there to help run part of the business, it started to crack. I believe Jaret had access to more money, more pressure, and more stress and then he started using and abusing drugs and alcohol. There were many days where he did not show up to run the business at all leaving the his younger friend in charge to run the business. Nobody in the business respected this kid and the business really floundered. This affected the entire business as Jaret was in charge of the moving crews, the routes and estimates. The entire business got backed up.

This was a business that Jaret could have had today and would have had a really nice life had it not been for his addiction to gambling and drugs. These are things that destroyed that business that forced my mom to sell it. This business was setup for him to have a life. I believe this period of time really reflects his addiction and learning disability.

Although Jaret has always been a nice person, I strongly believe his learning disability has led to stress that has put himself behind the 8 ball on so many things. That same stress leading to addiction and poor decisions.

I have a marketing business and we've worked with treatment centers. We have created many videos of personnel at these treatment centers who share their stories about addiction and how they ended up at treatment, what it did for them, the cycle of treatment, and if they were successful.

One of the owners of the treatment center said something in the video that has always stuck with me. "I didn't know the rules of the game. Once I understood what I was supposed to do, supposed to act, and abide by the rules, my life got easier and treatment worked."

I believe this to be true for Jaret. In addition his auditory learning disability I think multiplies this. Jaret probably doesn't even recognize he has this disability, because he doesn't listen well and thinks he is making the best choices for himself, when we clearly think he does not.

I've always questioned his decision making. I strongly believe it is related to his auditory learning disability and if treated as such he wouldn't go down some of the paths he would.

This kind of frustration can lead to extreme stress which leads to stress eating, poor sleep, and of course poor choices.

He has trouble listening, and probably needs medical attention, maybe a cochlear implant.

I am asking for leniency for Jaret. I'm asking for him to go into a mandated rehab and I'm asking for these things to happen so that I can see my brother grow up to be a productive person in society.


Jason Brietstein

# Exhibit 9

Judy Zodda
7404 Chesley Lane
Durham, NC 27713
judy@zoddacollegeservices.com
508-353-1144

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, FL 33301

Re: United States v. Jaret Brietstein, 0:2021cr60167

November 2, 2021

Dear Judge Dimitrouleas,

I am a 1969 graduate of The Ohio State University with a Bachelor of Science in Education. My subspecialty is Learning Disabilities. I have worked with students K-12 in different capacities for most of the last 50 years. I started out as a tutor for children diagnosed with Learning Disabilities early on in my career, working my way up to Program Coordinator supervising 33 clinicians, K-12 for a program developed for children with auditory processing and analysis deficits resulting in a reading disability. I also co-authored the manual for this program. For the last 16 years, I have been an Independent Educational Consultant (IEC) with a private practice in college counseling including, but not limited to, advising high school students with Learning Disabilities in the college search process.

I have known Jaret Brietstein for most of his life, though not in a professional capacity. However, I had been aware that Jaret, from his very early years in elementary school through high school, struggled to learn to read as well as specific subject matter, that most of the population would not have difficulty learning. Diagnosed early on with a short-term memory deficit (also known as working memory), made it difficult for Jaret to hold information in his head (such as a phone number, verbal directions, or a class that was taught by lecture which required the ability to take notes), any of which would result in his sub-par performance in the classroom. He also had an auditory processing deficit which made it difficult for him to associate letters of the alphabet with the different sounds they made (phonics), as well as the sequencing of those sounds. This deficit made it extremely difficult for Jaret to decode words (read), and the laborious effort required to do so combined with short term memory made it difficult for Jaret to even understand what he had just read.

At the time that Jaret was progressing through school, most of the assistive technology and learning strategies now commonly used today with students diagnosed with these deficits, were not then available. The overwhelming sense of failure that Jaret felt each day as he entered the classroom, wondering why learning was so easy for the rest of his classmates, but so difficult for him, I believe contributed to the path he chose and the current situation that Jaret finds himself in today. There is no denying that Jaret made many poor choices thus far over the course of his life. However, I also know that Jaret was not selling drugs to live a luxurious lifestyle. He wasn't out buying expensive cars, taking fabulous vacations, buying designer clothes or any of the pre-conceived notions that most people have of someone who sell drugs. He was doing it to feed his own habit to drown out the pain that he has felt since the time he was small and to barely keep a roof over his head.

I feel that Jaret is now contrite and knows there is a debt to be paid to society for breaking the law. I feel that he would benefit in an environment where he could learn a trade that was hands on and experiential as he learns best by seeing and doing. The results from the testing that he had when he was first diagnosed states that his strengths are visual and that he needs an environment that offers hands-on learning. He would also benefit from psychotherapy to help him change his perception of himself, currently that of a failure, to that of eventually being deserving of a productive and happy life once he has paid his debt to society.

In summary, Jaret is not a hardened criminal. I hope his sentence will reflect that. Thank you.

Sincerely,

Judy Zodda

# Exhibit 10

Richard J. Brietstein, D.P.M.
17396 Rainstream Road, Boca Raton, Florida 33496
Telephone: (954) 695-2387
wounddr@gmail.com

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301·

Re: United States v. Jaret Brietstein, 0:2021cr60167

September 29, 2021

Dear Judge Dimitrouleas:

By way of introduction, I am Richard J. Brietstein, D.P.M ; the father of Jaret. I was
born in Paterson, N.J. and raised in Fair Lawn, N.J. I attended Temple University and
earned an undergraduate B.S. degree in Biology from Long Island University.  I
attended the Ohio College of Podiatric Medicine in Cleveland, Ohio and earned my
Doctorate of Podiatric Medicine in 1971. I then completed a rotating internship at
Nassau County Medical Center in East Meadow, N.Y. and a surgical residency at
Northlake Community Hospital, Children's Memorial Hospital, and Hines V.A
Hospital all in the Chicago area. I have been in practice since 1974 retiring briefly in
2017 and reentering practice in 2020. I am board certified in foot and ankle surgery
by the American Board of Foot & Ankle Surgery and wound care by the American
Board of Wound Management. During my career I had three other podiatrists
associated in the practice, three offices, and on staff at eight hospitals. I was
residency director of the Medical & Surgical Podiatry Residency program at
Northwest Medical Center and Adjunct Clinical Professor at Nova University School
of Osteopathic Medicine and the Barry University School of Podiatric Medicine. I was
responsible for creating and co-medical director of the first wound care center in
Broward County at Florida Medical Center and later at University Hospital as clinical
director. I currently practice part time now and still maintain a clinical position at
the University Hospital Wound Healing Center. I volunteer and provide professional
services bi-weekly at the Caridad Center, an indigent care center located in Boynton
Beach.

Jaret was born on August 25, 1976 at Broward General Medical Center. His delivery was complicated by placenta previa; whereby the placenta covers the opening of the mother's cervix. There are risks associated both to the mother and newborn including breathing problems, birth injuries such as cerebral palsy and hypoxic-ischemic encephalopathy. He was then transferred to the NICU for 7 days before being discharged. I strongly believe that the period of anoxia created, had a profound permanent negative effect upon his cognitive function which has negatively impacted his life and fostered an inability to formulate sound decisions, weighing options and the consequences of such.

Jaret was a happy baby and child interacting with his older brother who is 16 months older. Jaret's personality was always outgoing, extremely social, and well liked by everyone and had many friends. Jaret when in grade school had cognitive issues that were identified and he was placed in special classes. He was very interested and involved with sports and began with T-ball and progressed through the different ranks and when he was 12 was chosen to play on an elite traveling team that earmarked talent with a future to play at a higher level in high school. Jaret played baseball as a freshman at South Plantation High School.

When he entered high school his problems began. He associated himself with kids who were involved with drugs which contributed to ending his participation in sports and negatively impeded his academic progress as well. A number of his former friends came from well -respected professional families and a lot of them followed in their parents' foot steps going on to college and earning post-graduate degrees in medicine and law. Jaret lost contact with them as they recognized the changes in his actions and personality causing them to disassociate them selves from him. Along with the drugs his academic progress faltered significantly and we enrolled him at Storm King, a private school in New York state with small classes offering the benefit of greater student teacher interaction which Jaret needed. In this environment his attention deficit disorder was improved greatly and he excelled academically. Jaret is an intelligent person. He was taught proper studying habits by preparing him for college. During his time there Jaret participated on the school basketball and baseball teams and graduated with his high school diploma. After graduation Jaret attended Valencia College, the junior college of UCF. Unfortunately he never completed the two year associate degree program.

reason let his license lapse and never renewed it. During the time he was a stock broker he drove a nice car which he bought himself , had two serious female relationships that if worked out would have been great for Jaret and I believe would have changed his life because he functioned well when he was involved with them. These two women loved and supported him and Jaret genuinely felt the same about them; but unfortunately the relationships ended.

Jaret then became associated with my wife in her business. She was a certified senior move manager transitioning elders from their homes to assisted living facilities and nursing homes. Jaret was an integral part of the business. He took the exam and became certified as well. He was in charge of operations making contact with clients, estimating job costs, and directing crews. He was very much liked by his clients and always reached out to meet their needs. He treated his employees with respect and kindness always providing them with food and drink on the moves. My wife sold her business and Jaret started his own long distance moving company which operated for about one year and ended. Once again Jaret started an initiative but was not able to sustain it because of poor money management. He lived with us for different stints and was selling insurance on the telephone in call centers but that never amounted to a lasting job. At that time Jaret was enrolled in AA and GA and attended meetings for a year on and off. I went several times with him to observe

For the past 14 years off and on Jaret has been involved and lived with a woman who is an addict, mentally and physically abusive, and who recently had a baby with another man. During that time period they had numerous feuds causing Jaret to move out, living with us and other people but always returned to her living in a dog-grooming store  owned by her. For some uncanny reason Jaret has decided to remain with her and feels a responsibility to care for this baby even though he knows it is not his. He is very loyal to this woman and her child beyond the point of any reason I can imagine other than it provides living quarters. I believe he thinks he is protecting her in some way so that her child is not taken away from her. They are both addicts and the casino is their second home fostering an environment conducive to gambling and drugs.

For the most part, this is a synopsis of his life as I can best recall. As you can see Jaret hardly finished anything he started out to do because his addictive personality of gambling, drugs, and alcohol blunted and prevented him from succeeding reinforced by his cognitive dysfunction. These repetitive failures created a person with extreme low self esteem and confidence. What is also sad that Jaret has lost contact with all of his old friends as they began their own journey and paths in life.

In recent conversations with him I am  listening to his contritous remarks relating an understanding of the seriousness and devastation of his actions and a desire to change his life. On several occasions he has voiced a desire to learn a trade and become an electrician while serving his term so that the time spent in prison would be productive and useful upon his release.

Jaret is not a criminal; he comes from a loving home. He was brought up amongst other professionals in both his family and parents' friends. Jaret is an extremely loving, loyal, and compassionate person. Jaret would literally be the first person to give the shirt off his back for someone.

Please consider that Jaret voluntarily surrendered , and this was his first offense. I realize and understand that he meets criteria for a safety valve . The horrible choice he made to actuate this drug transaction and suffer life changing consequences only reveals his functional cognitive defect to gain a few hundred dollars. A well functional normal human being would not have carried out that action realizing the risk and consequences of such.

I pray that you read all the letters you will receive concerning Jaret and see the true essence of his being and consider lowering his prison time and perhaps place him into rehab to finally rid him of his addictive personality with the ability to learn a trade so that he can leave with a skill to get a lasting meaningful job and become a part of society in a meaningful and productive way and make him feel whole about himself again.

My wife and I are in our mid 70's, we both have medical conditions which will definitely mitigate our longevity. We only pray we can see and be with Jaret before our demise. I love Jaret very much and want nothing more in life than to see him freed from the demons that have plagued him, have a secure job, and have his own family. That's a pretty big order to desire but I'd love for him to have a second chance.

Thank you again for your interest and consideration for my son.

Sincerely,

Richard J. Brietstein, DPM, DABFAS, FACFAS, CWS, FAPWCA



**WENDY R. STEELE, MSW**
**321 Anderson Pond Road, Aiken, South Carolina 29803**
**Telephone: (216) 338-5085**
**wendyrsteele@gmail.com**

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301

Re *United States v. Jaret Brietstein*, 0:2021cr60167

October 3, 2021

Dear Judge Dimitrouleas:

By way of introduction, my name is Wendy Steele. I was born and raised in Cleveland, Ohio. I attended Ohio State University and the University of Miami where I received a Bachelors in Fine Art. I later attended Barry University and obtained my Master of Social Work degree.

I ran a private practice in Miami. I have also been in the food industry and have work experience as diverse as rehabilitating homes and owning an Einstein Bagel franchise.

My greatest success, however, is my son and my grandchildren. With that in mind, and with the love I share with my extended family, I write this letter.

I am writing this letter on behalf of my cousin's son, Jaret Brietstein. His mother, Barbara, is my first cousin and we grew up together in Cleveland, Ohio, some 72 years ago. Barbara is like a sister to me.

I have known Jaret since his birth. Since Jaret was a child, one character trait has always remained the same, his sweetness and kindness. He has never demonstrated a mean bone in his body. He is a genuinely caring and empathetic man.

Eight years ago, I suffered a traumatic brain injury form a horse accident. I live in Aiken, South Carolina. Barbara wanted to come be with me. I was hospitalized, and Jaret insisted that he drive his mother, who had her own physical limitations, to be by my bedside and so she wouldn't be alone.

Jaret used to work for his mother's business that packed and moved the elderly and helped survivor families pack and ship the possessions of the family members they lost. I have watched Jaret interact with the elderly and other family members during difficult times that the move was to an independent or assisting living facilities. Jaret

1

was always engaging and empathetic patiently taking the time to talk and listen. He was always patient and kind which says a lot about his character.

Because I am an animal lover, I am sensitive to the way people interact with animals. For me, the way Jaret handled himself when it was time to put down the family's black Lab speaks volumes as to who he is. Jaret loved his dog and when Bo couldn't walk by himself, Jaret carried Bo in and out of the house.

The vet said that Bo was ready, but Jaret was not. Bo continued to lose weight and stopped eating. Jaret came to the realization that the time had come.

Jaret has never been exhibited cruelty to an animal, or for that matter, he has not been cruel to any person.

Jaret has made mistakes. This was possibly the biggest he has ever made. I am sorry for Jaret's behavior and poor judgment. We as a family love Jaret and I am praying you will also consider the goodness in him.


Respectfully.

_____

Wendy R. Steele

2

# Exhibit 12

**STACY SUSSMAN**
**STEVEN O. GOLDSCHMIDT**
**50 MASON STREET**
**WILLIAMSTOWN, MA 01267**

October 1, 2021

Judge William P. Dimitrouleas
US Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, FL 33301

Re:     United States vs. Jaret Brietstein
        O:2021cr60167

Dear Judge Dimitrouleas:

Stacy Sussman and I are honored to have been asked to provide a character reference for Jaret Brietstein.

Stacy and Jaret's mother, Barbara, have been friends for almost 50 years. Stacy well remembers when Jaret was born, and she has known him throughout the years as a sweet, loving and caring soul.

I first met the Brietstein family a bit less than 15 years ago, when Stacy and I first met and became a couple. I met Jaret and quickly admired many of the same qualities Stacy saw many years before – a devoted son and a smart and intelligent young man. It was not until many years later that I became aware of his struggles with a growing addiction to alcohol and drugs – a problem that overwhelmed me for almost four decades until I finally became clean and sober 20 years ago at the age of 50.

My own story is like the that of most addicts and alcoholics. My growing dependency on drugs and alcohol slowly consumed my life – it ended up destroying my marriage and greatly impacted my young son and those friends and family who loved me and tried, in vain to help me. In the end, like many afflicted with the disease of addiction, I did something that everyone thought could never happen to me – I ended up stealing from clients to support my growing habit. Eventually, my behavior caught up with me, as did the authorities – and like Jaret, I was arrested and faced the possibility of imprisonment.

Along with family and friends, I appealed to the local authorities in much the same way that Jaret and his family are now appealing his fate. I asked … pleaded … for a chance to turn my life around and seek treatment for my addiction, rather than be sent away to what surely would have been a fatal term in prison. I was truly blessed when my pleas were recognized by the authorities and rather than be sent away in handcuffs, I was allowed instead to pursue my sobriety at an inpatient treatment facility. I knew that one "slip" would mean the end for me. Slowly, "one day at a time" as is often said in recovery, I took the first of the well-known 12 steps and accepted my powerlessness and conceded that my life had become

unmanageable. In time, after in patient rehab followed by an outpatient program, and immersion in the world of recovery and therapy and ultimately redemption, therapy and with the support of family and friends, a miracle happened. I found renewed faith and in the words of the 3rd Step Prayer, I was "relieved of the bondage of self". I made amends to those I had harmed and even managed, through the success I was able to finally achieve, to repay the moneys I had stolen.

Stacy and I believe in Jaret. We believe in the power of redemption. And we believe that given the chance of being treated for the disease of addiction, Jaret will find himself and find sobriety and rid himself of the bondage of this dreadful disease that brought him to the dark side.

We hope and pray he is given that opportunity.

# Exhibit 13

## JAYNE LEVINE L.M.H.C.
### (561) 271-0153

September 26, 2021

Judge William P. Dimitrouleas
Southern District of Florida
United States District Court

Re: Jaret Brietstein
DOB August 25 1976

Your Honour,

My name is Jayne levine. I am a Licensed Mental Health Counselor (MH6838) and a close family friend of J. Brietstein for the past 21 years.

I have seen Mr Brietstein going through ups and downs in life over the past decades. I can attest he is a good natured person who grew up in a fantastic home with excellent morals guidance and support. Mr Brietstein was at family occasions and presented with pleasant social grase.

I know that Mr Brietstein was involved with his mothers business and appreciated the opportunity of assisting in creating and building it to be a great successful moving company. I also am aware that Mr Brietstein suffers from Major Depression Disorder With Severe Anxiety as evidenced by his many episodes of hopelessness , angry outbursts, loss of interest in activities whereby he would isolate in his dark room for weeks at a time. He also has a history of sleep disturbance whereby at times he would sleep for days and /or stay up for days.

I would talk with Mr Brietstein on many occasions. He desperately wanted to feel different and a sense of belonging and was aware he was having a serious impact within his family system. He didn't know how to get out of his own way. Referrals were made and he would get caught in the hamster wheel.

Mr Brietstein did indeed resort to using vises to mask his pain. He was not proud of his behavior. He has had a great amount of therapy including a 12 step program and working with a sponsor; at times he felt a connection and it would come to a sudden end for various reasons including insurance, lack of self esteem and/or self worth. He has the ability to work a solid program when surrounded by appropriate influencers.

Mr Brietstein has been struggling with Mental Health Disorder And Addiction for the 21 years I have known him. Some people would give up and conclude people can't change. Others might believe everyday is a new day and one day at a time. I believe people can work towards freeing their minds and creating a sober healthy way of living when in a safe environment for an extensive length of time. I just hope that you will give an opportunity for prolonged treatment to Mr Brietstein while you make your decision.

Regards,

Jayne Levine L.M.H.C.
JayneLevinelmhc@gmail.com

Exhibit 14

October 2, 2021

233 South Federal Highway, Apt. 608
Boca Raton, FL  33432
M.954.604.1015
jill@aseniornation.com

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, FL 33301

RE: United States v Jaret Brietstein, 0:2021cr60167

To Whom It May Concern:

My name is Jill Poser, CGCM, CMC, and I feel compelled to write this letter on behalf of Jaret Brietstein. I am twice certified as a Geriatric Care Manager and would only write this letter if I felt that it was appropriate both personally and professionally.

I have a longstanding relationship with Jaret and his parents for close to 15-years. It is personally devastating to learn of his current circumstances and the state he finds himself. In the work that I do, I deal with many people with compromised executive function, mental health vulnerabilities or some form of dementia. Regardless, none of these individuals set out to sabotage their own lives, and so often adversely impact the people they love yet it is the place they find themselves. Jaret seems to be one of these people.  Throughout the years I have experienced Jaret as kind, caring and full of life. He is always ready to lend a hand, share a kind word and bring laughter to any situation. He has a wonderful gift of gab, an enthusiastic nature and seems to want to do right.  But all too often he seems to allow himself a bit of success personally and professionally only to quickly sabotage his own well-being, and by extension negatively impact the people who love him the most.

I am hopeful that the professionals involved in this case will conclude the same. Jaret needs significant professional help well beyond what he can understand for him to have a fighting chance to take his place in society in a way that will give meaning to his life and those around him.

Yours respectfully,

Jill Poser, CGCM, CMC



**Halle Weinberg**
**37355 Bunker Hill Drive, Solon, Ohio 44139**
**P: 216.965.7683      E: weinbergHL@gmail.com**

Judge William P Dimitrouleas
U.S Federal Building and Courthouse
299 East Broward Boulevard
Courthouse206B, Chambers 206F
Fort Lauderdale, Florida 33301

Re: United States vs. Jaret Brietstein

Judge Dimitrouleas,

I am contacting you regarding my first cousin, Jaret Brietstein. If asked how I would describe Jaret, hands down, I would say someone who is truly kind, caring and has a giving heart.

Family is absolutely everything and Aunt Barbara, Jaret's mom, is like a second mother to me. When we were young, we would pack up our car and drive to Florida to stay with my grandparents and aunt. Excursions to the beach, large family gatherings and lots of fond memories were created during these times. Jaret was the youngest of the five grandchildren and I was the only girl which made us the perfect pair.

In my 20s, I had the amazing opportunity to move from Washington, DC to Florida to work with my Aunt Barbara in her event planning business. Aunt Barbara, Uncle Richie, Jason and Jaret welcomed me with open arms. Aunt Barbara worked tirelessly at this business creating strong partnerships and loyal customers. She was a true role model for her family. From a young age, Jaret assisted in loading trucks, setting up heavy décor pieces and coming back late at night to tear everything down after the festivities concluded. Jaret always worked hard moving through the event space with precision and direction. He would organize the other workers providing clear direction and guidance. With robust business opportunities, Jaret and I would manage one event while Aunt Barbara and her team would head in another direction. Multiple events, multiple teams, and sometimes multiple challenges. No matter what was thrown at Jaret during an event, he always had a calmness that de-escalated the situation and was able to set a plan in place to quickly resolve the issue at hand. Even if he was not part of the initial crew, with one phone call no matter what time of day it was, he would show up to help. It was like calling in the calvary to save the day!  We were back together making things happen and it felt great!

When I moved from FL back to VA and then ultimately home to Cleveland, OH, I would hear about Jaret's successes. His diverse interests lead him to various sales and service positions focused on various high profile, high demand opportunities. Jaret's in-depth knowledge of the products and authentic approach brought him many accolades.  With each success brought hard times too. Jaret would celebrate the wins and internalize the losses. While Jaret was living his best life, like many, he was also struggling with work/life balance.

When my Aunt courageously battled with cancer three times, Jaret stood by her side through all the ups and downs of the disease. Seeing his mom going through this journey really took a toll on him. Jaret and Aunt Barbara have always been close and share a special mother/son bond. While he wanted to show strength and encouragement, inside he was shattered. Jaret tried his best to provide support. It's that call again that says we need help and Jaret's there when the going gets tough.

Years passed but whenever I was in town for business or a personal trip to Florida, Jaret would drop his plans to meet for a family dinner or a drive-by catch up session. It always meant a lot to me to be together. Our family means a lot to each other. We all need each other now more than ever.

A double edge sword for Jaret has always been his kind heart. He's giving, supportive and wants to help others. These characteristics have sometimes led him to make poor choices in friends and circumstances. His heart is always in the right place. He leads with compassion and drive. He puts his whole self into everything he does. With ongoing therapy, rehabilitation and family support, Jaret can once again become that man that can orchestrate a team, have clear direction and goals, and live a healthy and happy life. We know that recovery is a process that takes time. It takes patience. It takes everything you've got.

I'm writing this letter for your consideration of a lesser sentence for Jaret. Everyone has gone through something that has changed them in a way that they could never go back to the person they once were. This situation is just that. Every day is a chance to begin again. Everyday is a chance to change your life. Jaret needs this chance for himself and his family.

Thank you so much for your consideration and support,

*Halle Weinberg*

Halle Weinberg
General Manager, Destination Engagement
Maritz Global Events



Nancy Emerman
7462 Villa Ridge, Chagrin Falls, Ohio 44023  P: 216.965.7683409.8890
E: nancy@emermanteam.com

Judge William P. Dimitrouleas
U.S Federal Building and Courthouse
299 East Broward Boulevard
Courthouse206B, Chambers 206F
Fort Lauderdale, Florida 33301

Re: United States vs. Jaret Brietstein O 2021cr60167

Judge Dimitrouleas,

I want to introduce myself to you. I am Nancy Emerman, Jaret Brietstein's one and only Aunt. Jaret is my sister Barbara and brother-in-law Dr. Richard Brietstein's youngest son. Barbara and I are very close sisters.

Jaret as a child was happy, inquisitive, always full of energy and had lots of friends. His mother and father worked hard at their jobs while raising two young boys. Richard opened a podiatry practice and Barbara built Party Network, a successful party planning business which was very successful for over 20 years. Jaret proved to be a great "helping hand" in the party business – setting up and tearing down Barbara's amazing events. Even my children, husband Marty and I worked on Barbara's holiday parties. We'd leave cold Cleveland, Ohio to visit Aunt Barbara, Uncle Richie, Jason and Jaret every Christmas for years and years. The party business was hard work but brought our families close together.

Barbara changed careers in 2004 becoming a licensed senior move manager downsizing and moving seniors to independent and assisted living facilities. Our mother had Alzheimer's disease for three and a half years before passing away. Both Barbara and I have dealt with traumas and the horrors of this debilitating disease affecting not only the patient but also their families. Family has always been our number one priority and Jaret was very close to his grandmother, Nanny Helen.

Jaret joined Barbara in this start up moving venture, Bright Transitions. Years later, Jaret become a certified senior move manager as well. Jaret was very kind, patient, and caring working with the seniors. They showed Jaret respect and great appreciation for all his hard work in making their move an easy transition.

For 36 years, I have been a highly respected licensed realtor in the state of Ohio. In 2002, I was one of the nine realtors who brought Keller Williams to Cleveland, Ohio. Within my market center, I have built and lead a team of ten realtors, The Emerman Team.

My nephew Jaret has proven to be a talented salesman. He has sold health insurance, time-share vacations and worked as a licensed stockbroker. When Jaret has a goal and focuses on it, he does well. Poor choices in friends and getting involved in bad "situations" have gotten Jaret off track.

Jaret and I often talk about how successful he would be as a realtor and I truly believe it. I'm presently researching the possibility of starting the Emerman Team in Florida with my brother-in-law, Phil Emerman, managing the operation. Phil is currently an active realtor on the east coast of Florida.

With ongoing therapy including AA and GA rehabilitation, at some later date, Jaret would be an asset in my Florida business. He is learning-based and if given the opportunity to work in a positive nurturing environment, Jaret will thrive.

Jaret is extremely close to Barbara. I believe that Jaret's heart was broken watching his mother fight cancer three times while she suffered the effects of chemotherapy and radiation. Richard has many health issues including heart failure. Barbara and Richard's health are always in question. They both need Jaret as much as he needs them. They are each other's support system.

I'm writing this letter for your consideration of a lesser sentence for Jaret. We all deserve a second chance. Covid has changed our world and my sister and brother-in-law need their family around them more than ever. While I am organizing this new realtor team in Florida, I would love to help Jaret on his path forward towards a successful future.

Thank you for your kind consideration in this matter.

Nancy Emerman, CRS, GRI, ABR

# Exhibit 18

Wendy Koblick
5427 Costello Avenue
Sherman Oaks, CA 91401


Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301

Re United States v. Jaret Brietstein, 0:2021cr60167


October 28, 2021


Dear Judge Dimitrouleas:

My name is Wendy Koblick. My husband and I have been lifelong family friends of Jaret
Brietstein's parents, Barbara and Richard Brietstein,
meeting in college, over 50 years ago.

I am writing this letter with hope that it will help you to see what kind of person, Jaret
Brietstein is, despite the transgression that has led to this point.

I have known Jaret since he was a little boy, and over the years
have seen many aspects of Jaret's personality. I have found him to be kind,
dependable and well regarded among his family and peers.
He has always been proactive and dependable with work and family.

The transgression of selling drugs should not be the only factor you
look at in this case. I hope you will also consider that Jaret has no previous record and
has a dependency issue.
Drug addiction is an illness which can be better served in rehabilitation
rather than jail time.
It truly requires therapy and medical attention. Better served in rehabilitation.
He has been battling his addiction and has great support from his parents, siblings and
family.
All stand by him to resolve this addiction and help him fulfill his potential, to be the
better person we all know he is.

It was a mistake and one he takes full responsibility for.

Again, I can not say strongly enough that drugs are an addiction. An addiction of any magnitude is better treated with therapy and medical treatment that jail time.

Jaret deserves a second chance.

I hope the court is willing to give Jaret one.


Sincerely,

*Wendy Koblick*

Wendy Koblick

Exhibit 19

*Jeffrey A. Fiedler*

JUDGE WILLIAM P. DIMITROULEAS
U.S.FEDERAL BLDG AND COURTHOUSE
299 EAST BROWARD BOULEVARD
COURTROOM 205B, CHAMBERS 205F
FORT LAUDERDALE,FLA 33301

NOV 2, 2021

YOUR HONOR,

  MY WIFE AND I HAVE KNOWN JARET BRIETSTEIN FOR AS LONG AS HE HAS BEEN ON THIS
EARTH. HIS PARENTS ARE AMONGST OUR CLOSEST FRIENDS AND HAVE BEEN FOR OVER 50
YEARS. ALTHOUGH JARET, AS SO MANY OTHER YOUNG PEOPLE OF HIS GENERATION HAD
ISSUES AS THEY WERE MATURING AND BECOMING ADULTS, WE CAN SAY WITHOUT ANY
HESITANCY, HE WAS ALWAYS WELCOMING AND WARM, FRIENDLY, OUTGOING AND
RESPECTFUL. OUR CHILDREN AND BOTH JARET AND JASON, HIS BROTHER, BECAME FAST
FRIENDS AND OUR FAMILIES SHARED MANY WONDERFUL TIMES TOGETHER OVER THE YEARS,
BOTH IN FLA AND NY. IT IS EXTREMELY HURTFUL TO US TO KOW WHAT HAS HAPPENED TO HIM
AS WE CAN ONLY SPECULATE THAT SOMEHOW, SOMEWHERE, SOMETHING WENT AWRY AND
THIS IS NOW THE SITUATION HE FINDS HIMSELF IN. WE CAN ONLY HOPE THAT FOR HIMSELF,
HIS PARENTS AND SIBLING, FAMILY AND FRIENDS, THAT THE COURT WILL USE IT'S WISDOM
AND SENSE OF FAIRPLAY TO MITIGATE THE SENTENCING TO SOMETHING WHERE HE CAN
RECEIVE URGENT HELP RATHER THAN PENALTY. THIS, TO US, IS WHERE THE JUDICIAL SYSTEM
NEEDS TO RECOGNIZE THAT JARET NEEDS REHABILITATION IN ORDER TO RESUME HIS PLACE IN
SOCIETY AS A RESPONSIBLE CITIZEN.

                    SINCERELY,
                    JEFFREY AND JOYCE FIEDLER

*Joyce Fiedler*
*Jeffrey Fiedler*

*36 Severn Street*
*Scarsdale, New York 10583*

# Exhibit 20

Barbara A. Brietstein
17326 Rainstream Road
Boca Raton, Florida 33496
(954) 798-4180

Judge William Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courthouse 205B, Chambers 205F
Fort Lauderdale, Florida 33301

October 4, 2021

Re: United States v. Jaret Brietstein, 0:2021cr60167

Dear Judge Dimitrouleas,

I am Jaret Nathan Brietstein's mother. Jaret's lawyer, Rob Melchiorre explained to me what jaret did when he sold Meth to undercover FBI agents. I was told the amount he sold mandated a 10-year sentence. Jaret made $200 off the first sale and $100 off the second sale. (There is no excuse for selling any kind of drugs or using them for that matter.) Jaret walked into the Broward County courthouse alone and surrendered freely on his own.

Jaret was born August 25, 1976 at Broward General Hospital with the umbilical cord wrapped around his neck. He was placed in the ICU unit for 7 days. This is called placenta previa. He wasn't breathing at birth which could have caused some brain damage. When he was 4 years old, I took him to the mailman Center at Nova. There he was diagnosed with auditory memory issues. Enclosed please see copies from Nova Mailman Center.

Jaret was held back from starting kindergarten because of this issue. When he was in school with 8 to 10 kids in the class; he excelled. Jaret played soccer and baseball and loved all sorts. He was very well liked and had lots of friends. He was very social, funny, and outgoing. As he got older in high school, he became caused some brain anxiety. He would start with therapist and the stop. After college he would go into long bouts of depression and leave the house for weeks or months and not take the meds prescribed. He has been Baker acted at Imperial Point hospital.

Jaret is a smart young man who passed his Series 7 license exam the first time. He also has a health insurance license. He was a great salesman and leader for our Senior Moving business. Jaret started working for me in high school setting up parties. His tasks included emptying the trucks, setting up chairs and tables, blowing up balloons,

wiring lights to the tables and trees. Then at the end of the night he would help to tear it down. He was a great worker and got along with all the employees.

As a mother and grandmother; I tried to lead by example, as my parents taught me. Give to "Tzdekah". It is a Jewish word meaning GIVE BACK, GIVE TO. It just doesn't mean give money; it means giving of your self. After one of my bouts with cancer; I got involved with the 1000 Plus Club of Fort Lauderdale and sat on the Board for many years. I was also involved with Not My Daughter of Parkland another cancer organization. I sat on the board for the Alzheimer Association of SE Florida chapter and the board of Jewish Family Services.

My mother had Alzheimer's disease and from this experience Courtney, Jaret, and I started a senior move management company. Bright Transitions helped seniors move and downsize their lives. Jaret became a Certified Senior Move Manager. We would go out of our way to donate books to the Brandeis Book store, the blankets and towels and sheets to the Humane Society, beds and dressers were sent to families through Jewish Family Services and furniture and clothing went to Women in Distress. The clients loved Jaret and he truly loved helping them. The sales associates at these communities gave him a lot of business because he took such good care of their clients and treated them like he treated his  grand parents with kindness, respect, and love. The women packers loved working for him and even went to his apartment when he would go into a depression and not come to work. They wanted him to feel better and get back to the Jaret that they all knew. We created an Alzheimer's team for the Broward County walk and got all our employees to participate. The caring Jaret that was so good with Seniors, would listen to their stories as he packed. Many would say to me, I want to adopt your son. He was so kind. When our employees were working in 90 degree heat all day on a move; Jaret would stop and buy them drinks and a pizza or McDonalds so the employees could keep working until the job was finished and the client was moved into their new home totally set up, pictures hung, furniture placed, kitchen organized, and beds made. That business was strictly referrals from independent, assisted, and memory care communities. That business lasted 8 years on a great reputation.

***** I have enclosed pictures of Jaret after Raquel had beaten him. The definition of an abused boyfriend...is Jaret. Physically and mentally.

In January of this year, when he was at our home; he told me he had started taking Meth in the summer of 2020. He was an emotional basket case at the time from his girlfriend Raquel. He had left her at this time and someone offered him this drug to make him feel better. He told me " I knew I shouldn't do it because it is a very addictive drug Mom. I just wanted all the pain of this lying situation to go away."

Any man who would take on another man's child before and after the birth questioning whether it is his, is a good kind person That's what he has done. Was it manipulation by his girlfriend, emotional abuse; I am not a therapist so I don't know. But this situation would put any human being under tremendous stress due to the lies

of not knowing if you are the biological father. He had and still has high blood pressure. I now have severe high blood pressure since this situation arose and I am on meds. He was thoroughly bullied and harassed. She did it to me and my husband . We begged her to take a DNA test before the baby was born; but she refused and insisted it couldn't be anyone else's child but Jaret's and would not do a test. A copy of the DNA test after Faith was born is attached. The test was initiated by Jaret and Raquel's sister.

I supported a friend, who was involved with Women in Distress of Broward County by attending the luncheons at the Signature Grand. I listened to the speeches of the women telling their horrifying stories being chained to beds or locked in closets for days with no food or water or released to go to the bathroom. But I also heard from men who were controlled by crazy women who were beaten and then told how much they were loved. I believe Jaret is one these men. Raquel always controlled the situation with money, a business, drugs, a car and a roof. That is the addicted Jaret . Then there is the kind, sensitive, caring man who loves his family, friends and pets.

Jaret is an addict. If its not drugs, then it's gambling or drinking excessively. His last stay at Rehab, I believed he was taking baby steps toward wanting to be clean. He would talk about he successful men whom he had met there with good jobs and who owned their own companies. He also met a woman who was kind and caring and for the first time in a very long time he said to me..."what a difference between her and Raquel". When he was at rehab he would get up at 5:30 AM and a few guys would walk 5 miles before their day started and watch the sunrise. He would tell me it's such a great feeling. When he left the rehab center I believe he did drugs and the next call to me was Raquel needs me to take care of the baby and help in the shop. So, when the woman who is controlling your life and getting you drugs; you can't think or focus like a normal person for your every day needs. Another addiction is Raquel and she took over his life.

Jaret is a kind soul, who has a disease like diabetes. Diabetes is a disease that you have to learn to live with your whole life. He needs rehab, GA, NA, and AA.
He has a brother who at the age of 23, during the crazy dot com era 20 years ago; sold his company for a million dollars. That's a hard act to follow. He has seen his parents work hard for everything we have for 50 years. My husband still works part time and volunteers at age 76 despite his health issues. My husband and I are not gamblers, drinkers ,or drug users.

I strongly urge you to consider an alternative sentence. Long term mandatory rehab and house arrest or live in a halfway house or/and with volunteering at a Faith Farm or Goodwill or any other charity that is in need of helpers. Jaret always has a place to live after his legal problems have been resolved. He can live in our home under house arrest also.

My husband and I are not healthy people. I have had three major cancers. Thyroid removal breast cancer with double mastectomy, and my bladder was removed and I

deal with a urosotmy. My husband is in constant **Afib** with his heart and had one in a million virus attack his heart around 2005 when they wanted to do a heart transplant. He has Crohn's disease and from years of taking Humira that caused a rare condition vasculitis which has gotten worse over this past year. The end result will be his organs shutting down. I am begging for the leniency of Jaret's sentence. We would like to spend our last years on this earth with him. I know we will not be around in 7 or 10 years.

I see a troubled man who can't think straight from all the drugs taken over the years. I see someone who is very smart yet can't take that second to make the right decision. I see someone clouded by the thrill of gambling to the point of not saving a dime to eat. I see someone who's brain gets clouded from his addictions not THINK like a normal person.

I see a kindhearted soul. He loves dogs and babies and seniors. Every employee enjoyed working with and for him. He treated all with same respect no matter what their social status was or the color of their skin.

I looked at his Facebook page on his birthday while he was incarcerated. I saw so many friends from preschool, elementary through junior high, wishing him a Happy Birthday. I think that says something. He hasn't hung around these people for years.

I fear I will never be ale to hold him, laugh with him, cook with him, take another picture with him...just have my memories to live with for the rest of my living days.

For $300.00 I beg you for a reduced sentence; I am requesting leniency; not just for Jaret but for me. I hope you will give him an opportunity to be drug-free and a second chance at a life that he deserves.

He is a good person in his soul, a troubled person; but a kind and caring human being. When he was in jail and had to go before a judge; he thought he wouldn't be sent back to Joseph Conti. He gave his bunkmates all the smacks and money left on his Securus card because he thought he would not be returning.

Thank you for reading my letter.

Exhibit 21

Dear Judge Dimitrouleas;

My name is Vicki Gelfund and I live in Plantation, Florida. I am a travel advisor and have been with the agency that I am affiliated with for 28 years.  I have been in the travel industry for 38 years and have no plans to retire soon.  I have lived in South Florida since 1973. I still consider Chicago my hometown, but Plantation is my home. I have made so many wonderful friends here and still love it.

I met Jaret and his family in 1979 when he was a little boy. I had moved to Florida from Chicago and did not know many people.  From the moment I met the Brietstein family, I felt as if we had been friends for many years.  There were so many occasions that they would invite me to their home for family events, that even Jaret and his brother thought I was a cousin.

He had a loving upbringing as part of a good family. To this day, his parents and I are still very close.  I remember Jaret as a little boy bringing home "paintings" from school of his family, in a way only a young child could draw his Mom, Dad, brother Jason, and of course the dog. All displayed with pride on the refrigerator like most families do.

I know that recently he has had addiction problems, and that has been something he and his family are trying to help him with. I am not a therapist, but I am a believer in helping someone help himself.  There must be some type of therapy and counseling that he could be required to do rather than incarcerating him. The prison system is overcrowded, by sending someone who is, behind all the bravado, a scared young man would be detrimental to his health and his future. Locking him up will not cure his situation, it could only exacerbate it.  Of course, that is my opinion, but if you knew Jaret the way I do and his extended family does, you would also feel that incarceration would not be a good choice. He is, at heart, a good person that made some bad choices in the past.

I am hoping that you will rule with your heart as well as your head and know that with help Jaret will come back as a different and stronger person.

Thank you for taking the time to read this letter.


Sincerely,

*Vicki Gelfund*

Vicki Gelfund

*Vicki Gelfund, CTC*
*Travel Advisor*
*Palm Travel Agency*
*A Virtuoso Member*
*Affiliate of Coastline Travel*
*305 944-4000 ext. 164 Ofc*
*954 288-4626  Mobile*

# Exhibit 22

Jax Brietstein
4941 SW 34 Terrace
Hollywood, FL 33312

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301

Re: United States v. Jaret Brietstein

November 12, 2021

Dear Judge Dimitrouleas;

My name is Jax Brietstein. I'm 16 years old. I'm a Junior in highschool at Mcfatter Technical college, studying Cybersecurity and networking. I've lived in Hollywood Florida my whole life with my parents and my younger brother, Jett who is 13.  Jaret Brietstein is my uncle, the brother of my dad.

I have several memories of the times I've spent with my uncle Jaret. He came to my basketball games, offered coaching tips, because he was a former athlete. We would practice on my basketball hoop at my house. We also went to other sporting events. Jaret always came over to celebrate the holidays. I loved talking about basketball and watching the games on the tv with him.

 Jaret was there for me and the rest of the family whenever we needed him.
He would watch our two cats when me and my parents went away. Jaret was someone I could trust talking about coming of age topics.

I believe my grandparents need Jaret to help them through their health issues that they are facing everyday. He was my grandparents' main caretaker.

I am asking that you have some leniency on my Uncle Jaret so that I can see him again before I am an adult.

Thank you,

*Jax Brietstein*